# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **PATRICK R.,**[1] | ) | |
| | ) | **No. 19 CV 282** |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **ANDREW M. SAUL, Commissioner of Social Security,** | ) | |
| | ) | **February 18, 2020** |
| **Defendant.** | ) | |

### MEMORANDUM OPINION and ORDER

Patrick R. ("Patrick") seeks disability insurance benefits ("DIB") and supplemental security income ("SSI") on the basis that he is disabled by severe degenerative disc disease of the lumbar spine. Before the court are the parties' cross motions for summary judgment. For the following reasons, Patrick's motion is denied, and the government's is granted:

### Procedural History

Patrick filed his DIB and SSI applications in April 2016 alleging a disability onset date of September 23, 2011. (Administrative Record ("A.R.") 15.) After his applications were denied initially and upon reconsideration, (id. at 105-06, 138-41, 144-47), Patrick requested and was granted a hearing before an administrative law judge ("ALJ"), (id. at 149-50, 168-73). Patrick appeared for the hearing in November 2017 along with his attorney, a medical expert ("ME"), and a vocational expert ("VE").

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the first name and last initial of Plaintiff in this opinion to protect his privacy to the extent possible.

(Id. at 32-86.)  The ALJ issued a decision in February 2018 finding that Patrick is not disabled.  (Id. at 15-26.)  When the Appeals Council declined Patrick's request for review, (id. at 1-5), the ALJ's decision became the final decision of the Commissioner, *see Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015).  Patrick filed this lawsuit seeking judicial review of the Commissioner's decision, and the parties consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 11).

## Facts

Patrick was working as a service technician cleaning carpets and restoring property from water, mold, and fire damage when he injured his back.  (A.R. 37, 323.)  In November 2015 he underwent lumbar fusion surgery and has received injections, physical therapy, and pain medication.  (Id. at 323-24.)  Despite the treatment, he says he continues to experience back pain, sleep loss, and difficulty bending and lifting.  (Id.)  He alleges that in September 2011 he became unable to sustain competitive work because of his back.  (Id. at 324.)

## A.    Medical Evidence

The medical records Patrick submitted to the ALJ show that he has received treatment for a lower back injury and pain since 2011.  (A.R. 662, 668.)  An MRI of the lumbar spine from October 2011 showed mild degenerative changes in the lumbar spine at L4-L5.  (Id. at 20, 657-58, 662, 669-70, 818.)  Patrick was diagnosed with lumbar facet arthropathy and prescribed Norco for pain.  (Id. at 20, 657-58, 669-70.)  His examination was "for the most part benign," with no signs of sensory or reflex issues, dural tension, or atrophy.  (Id. at 662.)  Patrick received physical therapy and

steroid injections with selective nerve blocks but reported only temporary relief. (Id. at 20, 733, 807, 810, 930, 932-33, 936.) Examinations continued to show normal gait, strength, range of motion, sensation, and straight-leg results. (Id. at 20, 634, 647, 752-53, 807, 810.)

In mid-2012 Patrick reported back pain at a level of four out of ten at rest and difficulty sleeping. (Id. at 20, 559, 818-19.) He did not have weakness or numbness and exhibited good range of motion without pain. (Id.) An examining neurosurgeon noted, "[s]pine disease does not usually cause pain in the area that [Patrick] notes is painful. . . . I recommend that he increase his activity back to normal." (Id. at 818.) The physician also recommended physical therapy. (Id.) A July 2012 MRI showed "[r]ight convex curvature" with a "[s]mall left disc protrusion at L4-L5" but "[o]therwise normal alignment." (Id. at 20, 684, 924.)

Patrick reported moderate back pain in late 2012 through early 2013 but continued to have normal examinations. (Id. at 20, 823-24, 829-30, 833-34.) In March 2013 Patrick visited an orthopedic surgeon, Dr. Gary Shapiro, who noted on examination normal gait and strength and negative straight-leg testing. (Id. at 21, 687-89.) Patrick's primary care physician, Dr. Robert Tanney, similarly recorded normal gait, sensation, reflexes, and strength in his progress notes through early 2014. (Id. at 21, 837-48; see also id. 767, 1019-20 (records from Dr. Shapiro noting same during Patrick's April 2014 visit).) An April 2014 MRI confirmed mild degeneration at L5-S1 with "loss of disc hydration" but "well[-]maintained" disc height. (Id. at 21, 790, 793-94, 1021, 1036-37.) Patrick underwent a lumbar

discography in May 2014, which showed "partially concordant bilateral back pain of 10/10." (Id. at 21, 786-87, 791-92, 924, 1038-39.)

From mid-2014 to 2015 Patrick was "neurologically intact" on examination and displayed normal gait, strength, sensation, and reflexes. (Id. at 21, 856, 859, 862, 865, 868, 875, 1022, 1024.) A July 2015 MRI of the lumbar spine showed bulges in two discs, resulting in mild to moderate compression of right existing nerve roots at both levels, but was otherwise normal. (Id. at 21, 552-53, 1040-43.) Patrick underwent anterior lumbar fusion of L5-S1 in November 2015 without complications. (Id. at 22, 385, 424-25, 1046-47.) In the following months he reported some improvement in his back pain. (Id. at 22, 413, 417, 1028-31.)

Patrick started physical therapy in February 2016 but was discharged in March 2016 for lack of progress. (Id. at 397-418, 488-89, 512, 942-44, 1029-31.) At that time, he reported that his pain had "slightly intensified," making it difficult for him to walk for more than 10 minutes at a time. (Id. at 22, 509-12, 523, 945-46, 1033, 1048-60; but see id. at 485 (reporting that pain was not radiating into legs), 523 (noting that Dr. Shapiro was "unable to reproduce any of [Patrick's] pain").) X-rays showed some stenosis and settling of the anterior cage at L5-S1. (Id. at 22, 523.) His examinations continued to be normal. (Id. at 22-23, 523, 448, 450-51, 880, 883, 887, 891.) Patrick began aquatic therapy, which allowed him "to obtain pain relief while in the water." (Id. at 22, 523, 536, 970-1009.)

Patrick reported in August 2016 that he was "doing better than . . . before surgery." (Id. at 22, 1035.) He no longer had "sharp pain in his back that would stop

[him] in his tracks" and was taking less Norco. (Id.) X-rays showed a solid fusion at L5-S1. (Id. at 22, 1028, 1034-35.) Patrick's examinations through 2017 continued to be normal. (Id. at 22, 894-96, 903-12, 1010-12.) In August 2017 Dr. Tanney noted that Patrick's back pain had "[i]mproved some with lumbar surgery," that he could "perform [activities of daily living] adequately," and that he was "satisfied with his pain control on Norco." (Id. at 903, 908-09.)

## B.    Hearing Testimony

Patrick testified that he injured his back in 2011 and then had back surgery in 2015. (A.R. 40.) He said his back pain worsened after the surgery. (Id.) He has tried various treatments to manage his pain, including physical therapy, aquatic therapy, injections, and medication. (Id. at 40-41, 45-46.) Yet, according to Patrick, he still experiences intense back pain, which makes it difficult to sit, stand, walk, or do anything else for more than 20 minutes at a time. (Id. at 30.) His pain also makes it difficult for him to concentrate or sleep. (Id. at 39-40.)

In terms of daily activities, Patrick testified that he does not leave the house often. (Id. at 41.) He wakes up around 3:00 or 4:00 a.m. After he takes pain medication and stays awake a few hours, he sleeps for another hour or two. (Id.) The rest of the day he lies down, either leaning against a wall with pillows or on his side, alternating positions hourly. (Id.) He said that he is not able to perform chores but keeps his room clean. (Id.)

With respect to limitations resulting from his condition, Patrick testified that he can walk the dog for about 15 minutes before feeling pain. (Id. at 43.) He can

stand for about 10 to 15 minutes but cannot sit without continually adjusting his position. (Id. at 43-44.) He said that his physical therapist completed an evaluation indicating that he needs to take breaks throughout the day. (Id. at 47.)

## C. The ALJ's Decision

The ALJ followed the required five-step process in evaluating Patrick's disability claims. *See* 20 C.F.R. § 404.1520(a). At step one the ALJ found that Patrick had not engaged in substantial gainful activity since September 23, 2011. (A.R. 18.) At step two the ALJ concluded that Patrick has the severe impairment of degenerative disc disease of the lumbar spine status post fusion. (Id.) At step three the ALJ determined that Patrick's impairment does not meet or medically equal any listed impairment. (Id. at 18-19.) Before turning to step four, the ALJ assessed Patrick as having a residual functional capacity ("RFC") to perform sedentary work with the following limitations: he should be permitted to alternate between sitting and standing by sitting for one hour, and then standing for five minutes while remaining on task at his work station; he should never climb ladders, ropes, or scaffolds; he should only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and he should never be around unprotected heights. (Id. at 19-24.) At step four the ALJ found that Patrick is unable to perform his past relevant work, but at step five the ALJ determined that he can perform other jobs that exist in significant numbers in the national economy. (Id. at 24-25.)

**Analysis**

Patrick asserts that the ALJ erred by: (1) improperly evaluating his subjective symptoms; (2) incorrectly weighing medical opinion evidence; (3) failing to account for off-task time in the RFC assessment; and (4) erroneously denying his request for the VE to produce supporting documentation. (R. 10, Pl.'s Mem. at 8-15.) This court reviews the ALJ's decision to ensure that it is supported by substantial evidence, meaning "more than a mere scintilla" but no more than "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations and citations omitted). To adequately support a decision, the ALJ must "build a logical bridge from the evidence to his conclusion" that the claimant is not disabled. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). The court's role is neither to reweigh the evidence nor to substitute its judgment for the ALJ's. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). That said, if the ALJ committed an error of law or "based the decision on serious factual mistakes or omissions," reversal is required. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

**A.    Symptom Evaluation**

Patrick argues that the ALJ improperly evaluated his claims of pain. (R. 10, Pl.'s Mem. at 8-11.) An ALJ must consider objective medical evidence, daily activities, allegations of pain, aggravating factors, course of treatment, and functional limitations when assessing a claimant's subjective complaints. 20 C.F.R. § 404.1529(c); *see also* SSR 16-3p, 2017 WL 5180304, at *1 (2017). Typically, a court

7

grants deference to the subjective symptom evaluation because an ALJ has the opportunity to observe the claimant testify. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Nevertheless, an ALJ's "failure to adequately explain his or her credibility finding by discussing specific reasons . . . is grounds for reversal." *Minnick*, 775 F.3d at 937.

Patrick argues that the ALJ's symptom assessment cannot stand because she "cherry pick[ed]" evidence supporting a conclusion of no disability while ignoring contrary evidence. (R. 10, Pl.'s Mem. at 8.) He does not cite any examples of cherry picking or glossing over of any evidence. *See Gebauer, Jr. v. Saul*, ___ Fed. Appx. ___, 2020 WL 261231, at *5 (7th Cir. Jan. 17, 2020). Instead, he focuses on "illogical and impermissible inferences" he says the ALJ drew in discounting his subjective complaints. (R. 10, Pl.'s Mem. at 8-11.) For example, Patrick quibbles with the ALJ's finding that he "failed conservative measures" before surgery. (Id. at 8.) Patrick calls the phrasing "interesting" and suggests that the ALJ "seems to blame the failure of treatment on" him. (Id.) But the ALJ's language comes directly from Dr. Shapiro's treatment records, which state that "[t]he patient has failed conservative management over an extended period of time." (A.R. 424.)

Patrick also takes issue with the ALJ's finding that his spinal fusion surgery "was relatively effective at improving his symptoms and functioning." (R. 10, Pl.'s Mem. at 8.) He claims that the ALJ "blatant[ly] mischaracteriz[ed] . . . the outcome of his surgery" to justify her symptom assessment. (Id.) Yet the ALJ explained that post-surgery treatment records show that Patrick experienced "some slight

improvement in back pain" and was "neurologically intact." (A.R. 22 (citing id. at 413 ("pre-op lumbar back pain significantly improved" after surgery), 1028-29 ("excellent position of the cage at L5-S1" and "neurologically intact" about one week after surgery), 1030-31 ("overall slight improvement in [Patrick's] deep seated back pain," no leg pain, and "neurologically intact" with "a negative straight leg raise bilaterally about six weeks after surgery"), 1034 ("solid fusion at L5-S1 with an anteriorly placed cage"), 1035 ("overall [Patrick] is doing better than . . . before surgery" and "no longer has the sharp pain in his back that would stop [him] in his tracks")).) While the ALJ also noted evidence of sclerosis and settling of the anterior cage at L5-S1 after surgery, examinations demonstrated that Patrick was "neurologically intact with negative straight leg raise tests bilaterally." (Id. at 22 (citing id. at 1033 (noting that patient denies leg pain, numbness, or paresthesia and stating that Dr. Shapiro is "unable to reproduce any of [Patrick's] pain at this time")).) The ALJ thus did not draw improper references from the record.

Nor is there any evidence that the ALJ made "unsupported leaps of logic" or provided a "highly slanted iteration of the facts" in evaluating the severity of Patrick's symptoms, as he alleges. (R. 10, Pl.'s Mem. at 6, 8.) Rather, the ALJ considered the appropriate factors in performing her assessment. *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008). The ALJ first considered Patrick's subjective symptom allegations, including his repeated reports of "chronic and severe back pain," with difficulty concentrating because of pain. (A.R. 19-22.) She cited Patrick's testimony that "he has difficulty standing or walking more than 20 minutes at a time and

concentrating due to pain." (Id. at 19.) She also referred to evidence of record showing "regular treatment for severe back pain" dating back to 2011. (Id. at 20-22.) The ALJ observed that Patrick underwent physical therapy, steroid and facet injections, and a work conditioning program and took Norco, but still reported pain. (Id. at 20-21; see also id. at 823 (noting multiple spine and facet injections without relief).)

The ALJ next considered objective medical evidence, including records that supported exertional, postural, and environmental limitations. (Id. at 20.) An April 2014 lumbar discography indicated "partially concordant bilateral low back pain measuring [10 out of 10]." (Id. at 21.) A July 2015 MRI showed disc bulges at L4-5 and L5-S1 with "mild to moderate compression of the right existing nerve roots at both levels." (Id.) Dr. Shapiro performed a lumbar discectomy and fusion of L5-S1 in November 2015. (Id. at 22.) Thereafter, Patrick initially reported "slight improvement" but then he alleged that his pain worsened. (Id.) Patrick underwent physical therapy but was discharged in March 2016, with his therapist citing "lack of progression"; subsequently, he started aquatic therapy. (Id.; see also id. at 509-12, 1052-55, 1057.) He was diagnosed with chronic pain and failed back syndrome and referred to a pain management specialist. (Id. at 22.)

The ALJ determined, however, that the severity of Patrick's subjective symptoms, as he claimed, was inconsistent with the objective medical record as a whole, the treatment he received, and his own statements to providers. (Id. at 22-23.) As of July 2012, Patrick reported pain at a level of four out of ten and denied significant weakness or numbness in his lower extremities. (Id. at 20 (citing id. at

818-19 (treatment record noting that "[s]pine disease does not usually cause pain in the area that [Patrick] notes he is painful")).) He had good range of motion and imaging showed only mild degenerative disc disease. (Id.) His treating physician recommended that he increase physical activity. (Id.) Although he displayed "some facial grimacing" and tenderness during examination in December 2012, he had normal motion "with no significant weakness or diminished sensation" and could lift 40 pounds and perform physical tasks "at or about his perceived capabilities." (Id.) In March 2013 he denied radiating pain, numbness, and tingling in his lower extremities. (Id. at 21.) Throughout 2013 and into April 2014, he walked with a normal gait and had negative straight-leg raise tests and normal strength, sensation, and reflexes in lower extremities. (Id.) Imaging in April 2014 showed "mild degeneration of L5-S1 with loss of disc hydration but well-maintained disc height." (Id.) Patrick displayed limited motion in the lumbar spine in May 2014 but still had normal strength, sensation, and reflexes through May 2015, when he continued to walk with a normal gait and produce negative straight-leg raise test results. (Id.)

While the ALJ noted that Patrick reported worsening pain after undergoing lumbar fusion surgery in November 2015, she found that the evidence of record did not support his subjective allegations. (Id. at 22.) After his surgery, Patrick denied numbness or paresthesia, was neurologically intact, and had negative straight-leg raise tests. (Id.) In August 2016 Patrick reported he was doing better than before his surgery, as evidenced by the facts that he was not experiencing sharp pain and was taking less pain medication. (Id.) In November 2016 he displayed a full range

of motion in his lumbar spine, negative straight-leg raise tests, and normal gait, strength, sensation, and reflexes. (Id.) The ALJ thus found Patrick's lack of "significant pathology involving his lumbar spine" to be inconsistent with his subjective allegations. (Id. at 22-23.)

The ALJ further considered evidence regarding Patrick's daily activities and determined that they conflicted with his reports of disabling restrictions. (Id. at 23.) The ALJ relied on Patrick's ability to care for "personal needs," perform household chores, and shop in grocery stores. (Id.) She also noted that he had been able to work part time. (Id.) Patrick argues that the ALJ erred by relying on his daily activities to find him capable of full-time work, without explaining how such activities translate to his ability to work. (R. 10, Pl.'s Mem. at 10-11.) The ALJ expressly stated, however, that she "does not consider these activities to be conclusive evidence that [he] can sustain the demands of full-time work activity." (A.R. 23.) Rather, "when viewed in combination with the objective evidence and the claimant's course of treatment," they demonstrate a less restrictive RFC than the one championed by Patrick. (Id.) The ALJ was permitted to consider Patrick's daily activities, combined with all other evidence of record, in evaluating the severity of his alleged symptoms. *See Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016).

There indisputably are numerous reports of pain in the record, but the ALJ acknowledged these reports, properly considered the appropriate factors, and explained why, taken together, the objective evidence, Patrick's own statements to providers, and his daily activities showed that his limitations were not as severe as

he alleged. *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (finding no error in symptom assessment where ALJ "reasonably discounted [claimant's] testimony given the discrepancy between his reports" of pain and medical records showing "normal range of motion"); *Schmidt v. Astrue*, 496 F.3d 833, 843-44 (7th Cir. 2007) (finding no error in discounting subjective allegations of pain where the medical record did not support such claims). Accordingly, the court grants deference to the ALJ's assessment of Patrick's symptoms. *Jones*, 623 F.3d at 1160.

## B.    Medical Opinion Evidence

Patrick contends that the ALJ improperly weighed the medical opinion evidence, including Dr. Tanney's and the ME's opinions. (R. 10, Pl.'s Mem. at 11-15.) As to Dr. Tanney, the ALJ afforded only little weight to his 2013 and 2017 opinions. (A.R. 23.) Dr. Tanney had treated Patrick since 2011 and opined in 2013 that Patrick "is unable to sit or stand more than 30 minutes at a time in a 4 hour period" and must be permitted to shift positions. (Id. at 702.) In 2017 Dr. Tanney opined that Patrick: is unable to sit or stand for more than 15 minutes at a time or 2 hours in an 8-hour work day; has frequent pain that severely interferes with his ability to maintain attention and concentrate; and must shift positions, take unscheduled breaks, and miss more than four work days per month. (Id. at 1127-29.) An ALJ may not simply disregard a treating physician's opinion but must decide how much weight it should be accorded.[2] *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). At the same

_____

[2] On January 18, 2017, new regulations issued, eliminating the treating physician rule. *See* 20 C.F.R. § 404.1520(c). The new rules apply only to claims filed after

time, an ALJ "can give less weight to a treating source's opinion if it is inconsistent with the record," *Rainey v. Berryhill*, 731 Fed. Appx. 519, 523 (7th Cir. 2018) (citation omitted), or if she "articulates 'good reasons' for doing so," *Gibbons v. Saul*, ___ Fed. Appx. ___, 2020 WL 376499, at *4 (7th Cir. Jan. 23, 2020).

Here the ALJ provided good reasons for assigning Dr. Tanney's opinions little weight. The ALJ discussed Patrick's medical history at length and found consistent records showing that Patrick has "a normal gait, negative straight leg raise tests, and normal strength, sensation and reflexes in the lower extremities." (A.R. 23.) Based on this objective medical evidence, she found discrepancies between Dr. Tanney's opinions adopting "significant" limitations and Patrick's "normal" examinations. *See Hinds v. Saul*, ___ Fed. Appx. ___, 2020 WL 110257, at *2 (7th Cir. Jan. 9, 2020) (finding no error where ALJ discounted treating physician's opinion that conflicted with record evidence).

Patrick argues that the ALJ failed to provide "any specific citation or examples" to support her finding. (R. 10, Pl.'s Mem. at 13.) But throughout her decision the ALJ cited records showing Patrick's "normal" examinations, including normal gait, range of motion, and strength, sensation, and reflexes during the alleged disability period. (A.R. 20-23 (citing Exs. 2F; 3F; 4F; 8F; 9F; 13F/6-13, 25-37, 39-50, 54-65, 132-139; 144-210; and 15F/18, 33-45).) In some instances, the ALJ did not include specific pin cites within an exhibit. Nonetheless, she provided sufficient

---

March 27, 2017. Here Patrick filed his applications for disability benefits on April 18, 2016. (A.R. 15.) Thus, the prior rules in 20 C.F.R. § 404.1527 govern this matter.

citations to allow the court to locate numerous records, in the pages and exhibits referenced, supporting her basis for discounting Dr. Tanney's opinions. (See id.)

Patrick further asserts that the ALJ did not adequately explain her disagreement with Dr. Tanney's opinion on Patrick's concentration deficits. (R. 10, Pl.'s Mem. at 13.) In 2013 Dr. Tanney did not opine that Patrick had difficulty concentrating. (A.R. 702.) In his 2017 opinion Dr. Tanney indicated that Patrick's "moderate low back pain" was severe enough to require him to take unscheduled breaks every 20 minutes and miss more than four workdays per month. (Id. at 1127-29.) In her decision the ALJ acknowledged that Patrick reported "persistent back pain" and that he had difficulty "concentrating due to this [back] pain." (Id. at 19, 22.) But then she showed how Dr. Tanney's own treatment records contradicted his findings. (Id.) For example, 2017 progress notes reported that Patrick's pain only "occasional[ly]" radiates from his lower left back to the back of his thigh. (Id. (citing id. at 911).) Also, according to Dr. Tanney's notes, Patrick's symptoms "[i]mproved some with lumbar surgery in 2015," and, by August 2017, Patrick was "satisfied with his pain control on Norco" and could "perform [activities of daily living] adequately." (Id. at 22 (quoting id. at 903-04, 909).) Thus, the ALJ adequately supported her finding that Patrick's subjective complaints of pain—and any related difficulty "concentrating due to this pain," (id. at 19)—conflicted with Dr. Tanney's notes, (id. at 22). *See Hinds*, 2020 WL 110257, at *2 (finding that ALJ did not err in discounting treating physician's opinion that relied too heavily on claimant's complaints of

"constant lower lumbar pain," where the ALJ had reasonably determined that those complaints lacked the support of objective evidence); 20 C.F.R. § 404.1527(c)(4).

Patrick lodges one more attack on the evaluation of Dr. Tanney's opinions—that the ALJ failed to "address[] the length or nature of the treatment relationship." (R. 10, Pl.'s Mem. at 13.) The ALJ explained that Dr. Tanney was a doctor of osteopathy who qualified as Patrick's "treating physician." (A.R. 23.) While the ALJ did not expressly state that Dr. Tanney had treated Patrick since 2011, she did indicate that his notes showed normal examinations "throughout the alleged period of disability," which began in September 2011. (Id. at 15, 23.) The court finds that the ALJ "sufficiently accounted" for the length and nature of Patrick's relationship with Dr. Tanney. *Carlota R.M. v. Saul*, No. 18 CV 2873, 2019 WL 3410222, at *2 (7th Cir. July 29, 2019) (quotation omitted).)

Patrick next argues that the ALJ improperly discounted the ME's more restrictive RFC opinion. During the hearing, the ME presented a tale of two functional reports—one based on the objective medical evidence and another based on Patrick's subjective complaints. (A.R. 49-71.) He did so given the "unusual situation" the case presented insofar as the physical examinations were "normal," but the claimant reported "significant pain symptoms throughout the record." (Id. at 51.) As to the objective medical evidence, the ME provided a detailed recitation of treatment records from October 2011 through 2017, which repeatedly showed: "benign" and "normal" examinations with normal strength, negative straight-leg raising, negative FABER testing, normal heel and toe walking, normal gait and

sensory, full range of motion in the cervical and lumbar spine, ability to lift 40 pounds and carry 55 pounds 30 feet, and no neurological abnormalities. (Id. at 51-57, 62-63.) Based upon the physical findings, the ME opined that Patrick "has essentially no limitations because his reflexes, his strength, straight leg raising, his sensory examination, and the range of motion" generally are normal. (Id. at 58.)

At the same time, the ME acknowledged Patrick's frequent reports of "debilitating" pain. (Id. at 51-57.) The ME testified that physical therapy and injections did not provide sustained relief. (Id. at 51.) And despite reports of pain, the ME noted that in July 2012 the medical provider recommended that Patrick increase his physical activity. (Id. at 52.) The ME pointed to 2014 records in which Patrick reported "unrelenting" back pain, at a level of 10 out of 10. (Id. at 54.) But even in 2015 Patrick continued to have "really clean" physical examinations. (Id. at 55.) The ME explained that Dr. Shapiro based Patrick's need for lumbar surgery solely on a discogram and subjective allegations of pain, not on neurologic findings. (Id. at 70.) After undergoing surgery in 2015, Patrick reported that his pain worsened. (Id. at 56.) But August 2017 treatment notes showed that back pain "improved somewhat from the presurgical time." (Id.)

Given the alleged subjective symptoms, the ME provided a second RFC, based solely on Patrick's subjective complaints. Under this RFC, the ME limited Patrick to walking and standing two out of eight hours, sitting with appropriate breaks two to four hours out of eight, occasionally climbing, balancing, kneeling, crouching, or crawling, and abstaining from ladders, scaffolds, and unprotected heights. (Id. at 58.)

He could lift 10 pounds frequently. (Id. at 59.) And alternating between standing and sitting would be appropriate given the pain allegations. (Id. at 60-61.) The ME added the caveat, however, that because there was "such a discrepancy" between the objective findings and subjective allegations, an "assessment of credibility" would be required by the ALJ. (Id. at 69-70.)

The ALJ assigned "partial weight" to the ME's RFC based on subjective allegations. (Id. at 23.) The ALJ explained that the ME "himself acknowledged that his opinion was primarily based on the claimant's subjective reports of pain and indicated that the objective medical evidence documented no significant, ongoing physical limitation." (Id.) Thus, the ALJ limited Patrick to sedentary work with postural restrictions and a sit-stand option, allowing Patrick to alternate between sitting and standing by sitting for one hour and then standing for five minutes while remaining on task. (Id. at 19.) The ALJ declined to adopt the more extreme walking, sitting, and standing limitations in the ME's subjective RFC because the ME relied too heavily on Patrick's subjective complaints, which were inconsistent with objective evidence showing normal examinations throughout the disability period. (Id. at 23.)

Patrick argues that the ALJ impermissibly played doctor and erred by discounting the ME's opinion based on subjective allegations. (R. 10, Pl.'s Mem. at 14.) The court disagrees. As for allegedly playing doctor, Patrick does not point to any language in the ALJ's decision to support that assertion, and the court does not find instances in which the ALJ independently interpreted medical data. In any event, "[t]he use of a [ME] can help ALJs resist the temptation to 'play doctor.'"

*Gebauer, Jr.*, 2020 WL 261231, at *3. Here, by the ME's own admission, the objective evidence supported no physical limitations. (A.R. 58.) The ALJ granted only partial weight to the ME's second RFC because it was based primarily on Patrick's subjective complaints. (Id.) The ALJ was permitted to make such a finding, particularly since she adequately explained why objective medical evidence did not support the subjective complaints. *See Burmester v. Berryhill*, 920 F.3d 507, 512-13 (7th Cir. 2019) (finding no error in the ALJ's rejection of medical opinions where the ALJ provided detailed reasons showing why the record did not support the opinions). Thus, Patrick has not shown any error in the ALJ's evaluation of Dr. Tanney's or the ME's opinions.

## C.    RFC Assessment

Patrick argues that the ALJ lacked the support of substantial evidence for her finding that he could sustain sedentary work with certain postural limitations and concentrate "on a regular and continuing basis." (R. 10, Pl.'s Mem. at 11 (citing A.R. 23).) He contends that the "finding of unimpaired concentration comes from out of left field and is utterly without evidentiary support." (Id.) Patrick points to his own testimony for support:

> The surgery, the back surgery I had, it's been worse than what it was. I'm just limited to, you know, I can't sit, stand, walk, or anything for more than like 20 minutes without intensifying pain. It, it's hard for me to focus anymore. It's hard for me to concentrate.

(A.R. 39.) He also relies on Dr. Tanney's 2017 opinion that Patrick's frequent pain is severe enough to interfere with his concentration and requires him to take

unscheduled breaks every hour for 20 minutes at a time and miss more than four days of work per month. (R. 10, Pl.'s Mem. at 11 (citing A.R. 1127-29).)

The ALJ was only required to incorporate into the RFC "limitations that [s]he accept[ed] as credible," *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) (citation omitted), as the government points out, (R. 22, Govt.'s Mem. at 18). As explained above, the ALJ appropriately evaluated Patrick's symptom allegations and discounted his claim of disabling pain and related difficulties concentrating. (See A.R. 19-20, 23.) In doing so, the ALJ pointed to inconsistencies between Patrick's allegations of disabling pain and the objective medical evidence, his own statements, and his daily activities. (See id. at 19-23.) The ALJ also reasonably weighed the medical opinion evidence and granted little weight to Dr. Tanney, as explained above. (Id. at 23.) The court thus finds no error in the RFC assessment. (Id.)

## D.    VE Testimony

Finally, Patrick argues that the ALJ erred by denying his request for the VE to produce supporting documentation, and then compounded this error by relying on the VE's testimony.[3] (R. 10, Pl.'s Mem. at 14-15.) At step five an ALJ must ensure that substantial evidence supports the VE's testimony that "suitable jobs exist in

---

[3] Patrick claims that the ALJ improperly relied on unreliable VE testimony but does not develop an argument challenging the substance of the VE's testimony. (R. 22, Govt.'s Mem. at 18.) Instead, Patrick lodges a procedural attack based on the ALJ's denial of his request for documents supporting the VE's testimony. (Id.) Accordingly, the court does not consider Patrick's perfunctory argument contesting the accuracy of the VE's testimony. *See Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) ("It is well established in our precedents that 'skeletal' arguments may be properly treated as waived.").

significant numbers." *Chavez v. Berryhill*, 895 F.3d 962, 963 (7th Cir. 2018). "Evidence is not 'substantial' if vital testimony has been conjured out of whole cloth." *Id.* at 968 (citation omitted). At the same time, a VE's "cogent[] and thorough[]" testimony—based on "professional qualifications" and personal experience—may constitute substantial evidence, even where she does not produce data supporting her testimony. *Biestek*, 139 S. Ct. at 1155.

Patrick, through his attorney, asked the ALJ before the hearing to require the production of documents upon which the VE planned to rely at the hearing. (A.R. 321-22 (requesting "one page for each job that the VE testified existed with the number of jobs listed").) He explained that "vocational experts often testify about numbers of jobs that exist in a region for various occupations but fail to adequately identify the statistical source for those opinions or they rely on their personal experience." (Id. at 321.) The ALJ denied Patrick's request. (Id. at 338-42.) Because the ALJ did not possess such documents, she construed the request as one for the issuance of a subpoena. (Id. at 339.) However, the ALJ found that Patrick had not satisfied the required elements for a subpoena to issue and that the request was "premature" and "overbroad." (Id. at 339-40.) The ALJ explained that the request sought the VE's work product, along with documents that the VE might not rely upon or that could be obtained from public sources. (Id.) The ALJ declined to "curtail" the VE's testimony before the hearing even took place. (Id.)

At the hearing the ALJ asked the VE whether her testimony would be "based on [her] knowledge, training, education, and experience, and consistent with" the

*Dictionary of Occupational Titles* ("DOT"). (Id. at 72.) The VE responded affirmatively. (Id.) At the end of her questioning, the ALJ again asked the VE whether her testimony was consistent with the DOT. (Id. at 74.) The VE said, "[i]t is where the DOT offers guidance, and where it doesn't, [I] supplement[ed] the DOT [with] my own data and observations collected over some 30 plus years of vocational rehabilitation counseling practice." (Id. at 74-75.)

Patrick then asked the VE whether the DOT provides information about sit-stand options. (Id. at 78.) The VE said it does not but confirmed that a published article provided the basis for her testimony. (Id.) She could not locate the article but thought it could be found in the Journal of Rehabilitation. (Id. at 79.) Patrick then inquired whether the VE had placed employees or observed employees in jobs in which they were afforded a sit-stand option. (Id. at 79-80.) The VE responded that she "ha[d] done both" and provided a recent example. (Id. at 80.)

After completing his questioning, Patrick asked the ALJ to order the production of materials relied upon by the VE, including the sit-stand article and each of the calculations the VE used to arrive at numbers of jobs available. (Id. at 83.) The ALJ asked Patrick if he was seeking to have the VE redo her math on paper, and he confirmed that he was. (Id. at 84.) The ALJ then asked the VE whether she calculated her job numbers based on public information. (Id. at 85.) The VE responded affirmatively, identifying Occupational Employment Statistics and County Business Patterns as sources. (Id. at 82, 85.) Thereafter, the ALJ denied

Patrick's request, explaining that the VE confirmed her testimony was consistent with the DOT, her personal experience, and publicly available sources. (Id. at 25-26.)

Patrick asserts that the ALJ improperly "relieved the agency of its evidentiary burden" when she denied his request for the production of documents supporting the VE's testimony. (R. 10, Pl.'s Mem. at 14-15.) The court disagrees. Both the ALJ and Patrick asked the VE about her sources and methodology, as well as her conclusions. (A.R. 71-85); *Biestek*, 139 S. Ct. at 1156-57. In response the VE provided a detailed recitation of the methodology she used to calculate the numbers of jobs available and supported those findings with personal experience and publicly available information. (A.R. 71-85.) Her responses were both "cogent[] and thorough[]," *Biestek*, 139 S. Ct. at 1155, and she provided more than a "modicum of confidence" in the reliability of her estimates, *Chavez*, 895 F.3d at 969.

The court has little doubt that the VE's "testimony would be even better—more reliable and probative—if she had produced supporting data." *Biestek*, 139 S. Ct. at 1155. But the Supreme Court has squarely rejected the argument that a VE must produce supporting data to satisfy the substantial evidence standard. *Id.* at 1155-56. Where, as here, the VE's testimony was "sound" and not contradicted by the record, *id.* at 1155, substantial evidence supports her conclusion that "suitable jobs exist in significant numbers," *Chavez*, 895 F.3d at 967, even though she was not required to produce documents supporting her testimony. Accordingly, the court finds no error in the ALJ's reliance on the VE's testimony about whether Patrick could find other work. *See Biestek*, 139 S. Ct. at 1156.

## Conclusion

For the foregoing reasons, Patrick's motion for summary judgment is denied and the government's motion is granted.

ENTER:

_____

**Young B. Kim**
**United States Magistrate Judge**